[No. C. D. 2789. *En Banc.* December 4, 1952.]

*In the Matter of the Proceedings for the Discipline of* CURTIS H. COONS, *an Attorney at Law.*[1]

*A. Vernon Stoneman*, for board of governors.

HILL, J.—This is a disciplinary proceeding. The facts as found by the trial committee are as follows:

"1. That the respondent, Curtis H. Coons, was admitted to the Washington State Bar Association on August 19, 1942, and at all times hereinafter mentioned has been and now is a practicing attorney in Bremerton, Washington.

[1]Reported in 250 P (2d) 976.

"2. That the respondent, as attorney for Joseph A. Markum, filed a complaint for divorce in the Superior Court of the State of Washington, for Kitsap County, cause number 22806, on December 3, 1946, in which summons and complaint were served personally upon Clara F. Markum at #82-D Harper Drive, Turtle Creek, Pennsylvania, by a deputy sheriff of Allegheny County, Pennsylvania. Mrs. Markum was thereafter represented by Marion Garland, Jr., of Bremerton, Washington, and the cause was tried before Honorable H. G. Sutton, Judge of the Superior Court for Kitsap County, in the month of April, 1947, who denied Joseph A. Markum a divorce. That respondent appeared for the plaintiff in said action, and in all proceedings, and had knowledge of the personal service upon the defendant in the action. No formal order of dismissal has ever been entered in said cause #22806.

"3. That on or about August 23, 1949, respondent commenced a second divorce action for Joseph A. Markum in the said Superior Court of the State of Washington, for Kitsap County, cause number 26668, by filing a complaint on said day, and filed on the 23rd day of August, 1949, an affidavit for summons by publication which had been executed before respondent as a notary public on the 20th day of August, 1949, which affidavit set forth the following language:

" 'That affiant does not know and is unable to ascertain the present whereabouts of the defendant, and for this reason it is impossible to send any communication to the said defendant.

" 'The affiant has mailed a copy of the summons and complaint in the above-entitled action to the defendant at her last known address.'

"4. Respondent thereafter on November 25, 1949, filed a motion and affidavit for default in cause #26668, and the order of default, findings of fact, conclusions of law and decree granting Joseph A. Markum a divorce from Clara F. Markum were signed by Honorable Frank W. Ryan on January 26, 1950.

"5. That said cause had previously come on for hearing before the Honorable Frank W. Ryan on November 28, 1949, at which time respondent offered himself as a witness to corroborate the testimony of the plaintiff relative to plaintiff's residence, and as such witness and under oath, testified:

" 'I tried to effect personal service. I got a return of "not found" on it. The letter came back to me, the same address Mr. Markum gave me, and I've known him to send money, but how it's being picked up, I don't know. I do know that the letter I wrote did return to me and I have it in my file.' That after some colloquy between the court and respondent, respondent advised the court that he would check on the whereabouts of the defendant Clara F. Markum and the minor children of the parties.

"6. The matter was thereupon continued until December 27, 1949, when respondent again appeared before the Honorable Frank W. Ryan, at which time the court addressed questions to James Munro, then Prosecuting Attorney of Kitsap County, and to respondent, relative to their success in locating the said Clara F. Markum, and at which time respondent stated to the Court: 'I don't even know where to begin looking for them. I only have letters' and later further stated to the Court: 'In August, I sent a letter to Clara Markum, General Delivery, Pittsburgh, and, of course, I received it back again.' and further stated, in answer to a question by the court: 'Her parents are dead.'

"7. That at all times during the pendency of cause number 26668 respondent had the office case file of cause number 22806 in his office in Bremerton, Washington, available for use, and had sent support money payments by and through Viola Landry, his stenographer and secretary, to Clara F. Markum at 82-D Harper Drive, Turtle Creek, Pennsylvania, in February and March of 1947. That respondent sent no communication addressed to Clara F. Markum at said address in connection with cause number 26668, and stated to the court that he had no knowledge of the whereabouts of the defendant in said action; and made the statement hereinabove set out relative to the plaintiff in the action sending money, but that such statements were based on representations made to respondent by Joseph A. Markum, and without personal knowledge on the part of the respondent.

"8. That respondent knew at all times during the pendency of cause number 26668 that personal service of summons and complaint in cause number 22806 had been effected upon Clara F. Markum at 82-D Harper Drive, Turtle Creek, Pennsylvania, and knew, or should have known that information as to the whereabouts of Clara F. Markum in the year 1949 might have been secured by addressing a communication to that address; and that in the careful and competent performance of his duty as an attorney at law

he should have instituted an inquiry or investigation as to the whereabouts of the said Clara F. Markum at said address.

"9. That respondent failed to advise the Honorable Frank W. Ryan on November 28, 1949, December 27, 1949, and January 26, 1950, of the existence of cause number 22806 in the Superior Court of the State of Washington, for Kitsap County, or the continued pendency of said action, or that in such action the said Clara F. Markum had been personally served with summons and complaint, as it was his duty to do in response to the questions of the Honorable Court, and in view of the request of the Court to respondent, and to the prosecuting attorney of Kitsap County to secure additional information as to the whereabouts of the said Clara F. Markum.

"10. That respondent, in his statements made to the Court and attitude before the court, studiously avoided any reference to prior representation of Joseph A. Markum, or that he or his office had had any previous direct contact with the said Clara F. Markum."

From these findings of fact, the trial committee concluded that Curtis H. Coons was guilty of unprofessional conduct and had violated his oath of office as an attorney at law and the canons of professional ethics, and recommended his suspension from the practice of law for a period of thirty days.

The only finding of fact to which Mr. Coons took exception is No. 10. He excepted to it for the following reasons:

"I. That said finding states a conclusion which is not supported by clear and convincing evidence.

"II. That the record herein discloses that during the hearing on December 27, 1949, your respondent offered to have his client, Mr. Markum, appear at the office of the Prosecuting Attorney and that during said hearing and on said day your respondent concurred with the Prosecuting Attorney in requesting a continuance to give the Prosecuting Attorney an opportunity to locate Clara F. Markum, and that the presumption that your respondent acted with proper intent has not been sufficiently overcome.

"Your respondent respectfully requests the Board of Governors to consider his previous unsullied record before the courts of this state and the record herein, and to find that the notoriety and censure of a reprimand by the Board of Governors will be sufficient protection to the lay public

which places its trust in the bench and bar and will adequately assure the bench and bar that the respondent, who during these proceedings has benefited from the opportunity for self-examination, deeply regrets the actions on his part which were the foundation of these proceedings."

The board of governors of the Washington state bar association, after studying the entire record, concluded that the facts were as found by the trial committee, and recommended the suspension of Mr. Coons for a period of thirty days.

We think the findings should be supplemented with the following facts, taken from Mr. Coons' own testimony and from the pleadings in the two divorce proceedings, which are in the record as exhibits.

It developed at the trial of the first divorce action, before Judge Sutton, that the plaintiff, Joseph A. Markum, was living with another woman in Bremerton. As previously indicated, the divorce was denied in the early part of 1947; however, no final findings were made or order of dismissal entered. The reason for Judge Sutton's refusal to grant the divorce and his dismissal of the action does not appear from the record except by inference from a question asked Mr. Coons by his counsel and the answer thereto:

"Q. In other words, Markum was still living with this other woman, who caused a dismissal of the first divorce? A. That is correct."

A child was born to Markum and the woman with whom he had continued to live after Judge Sutton's refusal to grant a divorce in 1947, and, because Mr. Coons was anxious that the child be legitimatized, he began the second divorce action for Mr. Markum, in August, 1949. In the complaint in the second action he stated the grounds for divorce in the identical language used in the first proceeding:

"That the defendant has, by numerous cruel and annoying acts, words and deeds, rendered plaintiff's life burdensome in the extreme; so that plaintiff can no longer live with defendant as her husband or at all."

(There was a further allegation in the complaint in the first action, "that plaintiff and defendant have lived sep-

arately for more than one year last past," which was not repeated in the complaint in the second action.)

Mr. Coons must have known that there had been no "cruel and annoying acts, words and deeds" since Judge Sutton's refusal to grant a divorce on those grounds. A reason for studious avoidance of any reference to the earlier action is quite apparent.

We quote an excerpt from Mr. Coons' cross-examination:

"Q. Isn't it a fact, Mr. Coons, that you knew if you revealed that prior case to the Court that the Judge would deny this divorce? A. I didn't know what the Court would do with that information if it had it."

We are of the view that Mr. Coons knew, as any other attorney must have known, that if Judge Ryan had known of the previous divorce action, the second action would likewise have been dismissed. The trial committee's finding to which exception was taken, that in the second action Mr. Coons "studiously avoided" any reference to the prior action, is certainly supported by the record.

At the hearing in the second divorce action on November 28, 1949, Mr. Markum testified that he had sent a payment of thirty-five dollars to his wife the month before, *i.e.*, October, 1949. Judge Ryan was naturally greatly concerned about the apparent inconsistency that Mr. Markum was able to make support payments to Mrs. Markum in October, 1949, and Mr. Coons was unable to get personal service on her in the divorce action then being heard. At the conclusion of the hearing on that date the following colloquy took place:

"THE COURT: I just wonder if perhaps a little more exhaustive investigation might not reveal where this woman is living? MR. COONS: I think she could be found. THE COURT: I'm sure she could be. MR. COONS: He's been away from home some 4-½ to five years now.

"THE COURT: He still has a 13-year-old boy. How do you know the 18-year-old girl is self-supporting? THE WITNESS [Mr. Markum]: I presume that she's working. THE COURT: You don't know. You've never communicated with these children. How do you know she [is] working or self-supporting? THE WITNESS: She must. THE COURT: Because

she's eighteen? THE WITNESS: Well, not necessarily because she is eighteen, but I think she's one of these kind that likes to go out and make a living. THE COURT: You don't know anything about it. As a matter of fact, Mr. Markum, —

"MR. COONS: I suggest Your Honor enter an order for the support; that that will cover the children. If he doesn't pay —THE COURT: I don't know if I can make an order of support without knowing the status of the children. I just feel that with a little effort on Mr. Markum's part, he can find out more about it. He's the one who left the home four or five years ago, but apparently her conduct was good enough as far as he was concerned to take care of these two young children. Now, apparently, some of his mail is received and some isn't. What I'm concerned about more is the children. I think they should be provided for. I'm going to continue the case for thirty days, or I'll make it until December 27th. I'm going to ask that Mr. Markum by that time find out where his wife is. I don't know whether this 18 year old girl—she could be lying sick in the hospital, for all you know. She received some of your mail. You can certainly find her. MR. COONS: *I'll check on that myself.* THE COURT: *I think perhaps, Mr. Coons, if you would take the responsibility, we could find out more about it,* but I do feel that the order should include support money for the children. Maybe the 18 year old is married. We do not know. Or she might be sick in the hospital. We do not know. So I'll continue it until December 27th." (Italics ours.)

Mr. Coons' explanation to the trial committee for his failure to attempt to secure personal service on Mrs. Markum in the second divorce proceeding at the address where she had been served in the first divorce proceeding was that his client told him she had moved from that address, and that he had a right to believe his client and to assume that Mrs. Markum was no longer at that address. However, as indicated in the italicized portion of the quotation above, Mr. Coons assured the court that he would check personally on the matter of Mrs. Markum's address. Any *bona fide* checking would have included inquiries at the address at which he knew Mrs. Markum had been in November, 1946. Nevertheless, when the matter came before the court on December 27th, when Judge Ryan asked, "Have you found

these people?" Mr. Coons replied: "I don't even know where to begin looking for them."

Mr. Coons had, as an attorney, taken an oath which reads in part as follows:

"I will not counsel or maintain any suit or proceeding which shall appear to me to be illegal and unjust . . . ; I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law."

The violation of that portion of his oath was definitely established, and had the trial committee and the board of governors recommended disbarment we would not have been surprised. Seeking to find some clue to what seems to us the extreme leniency of the trial committee and the board of governors, we have very carefully weighed those matters which Mr. Coons urged, in addition to his right to believe his client, by which he sought to justify or mitigate this violation of his professional obligation.

Mr. Coons testified that, before commencing the second action, he telephoned Marion Garland, Jr., who represented Mrs. Markum in the first divorce action, and asked him if he could locate his former client, and that Mr. Garland gave him a noncommittal answer. Mr. Garland's testimony was that Mr. Coons called him and asked if he was still representing Mrs. Markum, and that he told Mr. Coons that he would not represent her unless she re-hired him. This conversation, it seems to us, served no purpose other than to give Mr. Coons a green light for an attempt to re-litigate Mr. Markum's divorce action on the same issues as those presented at the previous hearing, before Judge Sutton.

Mr. Coons and Mr. Garland agree that Mr. Garland was in the courtroom on November 28, 1949, when Mr. Markum testified in the second divorce action and when Judge Ryan attempted to pin him down concerning his wife's whereabouts, and that during that examination Mr. Coons approached Mr. Garland and asked him if he knew where Mrs. Markum was, and that Mr. Garland's reply was negative. This seems to be the only effort that Mr. Coons made to ob-

tain the wife's address, other than urging Mr. Markum to locate her.

As the second divorce action was heard on the default divorce calendar, Prosecuting Attorney James Munro, representing the state of Washington, was in the courtroom on November 28th. He, too, heard Judge Ryan's efforts to obtain information from Mr. Markum as to Mrs. Markum's whereabouts, and the judge asked him, as prosecuting attorney, to investigate to determine whether Mrs. Markum had received the support money Mr. Markum testified he had sent her. Mr. Coons testified that Mr. Munro contacted him and asked if he knew Mrs. Markum's address, and then, to quote Mr. Coons:

"I told him I did not. I did offer to make my files available to him, and as the record shows, subsequently, I even offered to send Mr. Markum to his office so he could question him."

Mr. Munro was very definite in his statement that Mr. Coons told him he had no information as to Mrs. Markum's whereabouts; but he had no recollection of the offer to make the files available to him, although he conceded it may have been made. The record of the continued hearing shows that Mr. Coons did ask Mr. Munro if he wanted Mr. Markum to go to his office for questioning.

Unless when Mr. Coons offered to permit Mr. Munro to examine his files he intended to make available the files in the first divorce proceeding, of which Mr. Munro then had no knowledge, the offer was only a gesture; any investigation of the file in the second proceeding would have been fruitless. We do not believe that Mr. Coons intended to make the really pertinent file, the one in the first divorce proceeding, available to Mr. Munro. The inference that we draw from Mr. Coons' testimony is that he himself did not investigate that file until after the commencement of these disciplinary proceedings, and then he "dug back" in his "dead" files to find it.

Mr. Coons also testified that before the divorce decree in the second proceeding was signed on January 26, 1950, he

told the judge that he believed that if Mr. Markum had made a serious search he might have been able to locate Mrs. Markum, and that he, Mr. Coons, did not believe that Mr. Markum had made a payment to Mrs. Markum in October, 1949, as he testified. Concerning such statements Judge Ryan testified:

"Mr. Coons was very insistent that he had made those statements to me and all I can say, and all I can say now, is that I just can't remember them."

We find nothing in the record by way of mitigation except that Mr. Coons' record heretofore has been good. Mr. Garland, who had known him since he started to practice law, testified:

"I found him very honorable to practice with. I found his conduct good and certainly I found his character good in my dealings with him."

We have just suspended an attorney for three months for taking advantage of a client (*In re Lovell, ante* p. 457, 250 P. (2d) 109); it would seem that the penalty for misleading the court should be no less.

It is ordered that Curtis H. Coons be suspended from the practice of law in the state of Washington for a period of three months, the period of suspension to commence thirty days after the filing of this opinion.

SCHWELLENBACH, C. J., MALLERY, GRADY, HAMLEY, and FINLEY, JJ., concur.

DONWORTH, J. (concurring)—I concur in the result reached in the majority opinion, but I consider the period of suspension inadequate for the offense involved.

OLSON and WEAVER, JJ., concur with DONWORTH, J.